1830394, B.P. v. David West, Inc. Thank you, and may it please the Court. My name is Lisa Blatt, and I represent B.P. This case involves an appeals panel decision that read the Deepwater Horizon Settlement Agreement to mandate recovery to a professional basketball player who received everything he was promised under a contract with the New Orleans Hornets. For two reasons, the District Court abused its discretion by not reviewing this decision. First, the appeals panel read the settlement agreement to require payment to claimants who suffered no loss, and second, the appeals panel deemed it irrelevant whether a claimant has any good-faith basis to attest to a spill-related loss. First, on the issue of loss, the claimant here is David West, who signed a five-year contract with the New Orleans Hornets in 2006. He secured a front-loaded contract in which the team agreed to pay him descending amounts in each year. In 2009, it was $8.7 million, and in 2010, it was $8.5 million. Because Mr. West received everything he was promised under this contract, he suffered no loss and had no claim. The settlement agreement's text, structure, and purpose incorporate the ordinary understanding of the word loss. Mr. Black, can I ask you about that? There's a sentence in your brief on this point that is interesting to me. This is on page 30 of the opening brief, and it says, in order to recover under Exhibit 8A, which is the thing I think you were just referring to that incorporates the settlement terms, a claimant must show that his or her earnings after the spill were lower than the earnings he or she reasonably and legitimately would have expected to receive during that period. But those words, reasonably and legitimately, don't appear in Exhibit 8A. So I'm looking at page 2339 of Exhibit 8A, and it says, calculate expected earnings. It's got a formula there. It doesn't say anything about reasonably and legitimately. And so I guess my principal question is, why do we not use this when we're trying to figure out whether he suffered a loss or whether his calculated expected earnings went down over the benchmark period? Sure. So the 2329 or 2339 is quoting from the compensation formulas, which go to—they're basically a damage formula that show you how to compensate an amount of loss. And under that compensation formula, you're correct. The expected earnings were greater than the actual earnings. The text I'm relying on, Judge Oldham, is not related to the compensation formula and is not tied to the compensation formula. And that's on Record Excerpt 27, which is 2325. And that defines the underlying claim as one as a claim for lost earnings. And that is expected earnings minus actual earnings. And most significantly, Definition K, which is on page 31, that defines expected earnings as the amount of earnings the claimant would have expected in absence of the spill. It's not tied to any formula. And here we know that's exactly the same as his actual earnings. So his expected earnings were dictated by the contract. That's $8.5 million. And his actual earnings are dictated by the contract. So the point is that the latter two sources prevail over this calculation for expected earnings? Yes. Our position is that the compensation calculation formulas kick in when the claimant has a loss to begin with. And then you go to how you calculate damages. But the settlement agreement and the provisions I just read you do not dispose with the notion that you're supposed to have a loss in the first place. And we think this Court's very recent decision in JED sort of compels that conclusion. In there, the claimant, the formula actually showed a loss because the expected earnings were greater than actual earnings. But that was only because the actual earnings were zero and the claimant was not in operation. But the computation formula is absolutely just like in this case showed a loss. And this Court held that just producing a number under the loss amount doesn't entitle you to recovery when the loss amount is divorced from economic reality. And in JED, the claimant, the formulas assumed that the type of claimant who could have actual earnings has to be actually trying to earn money. And here, the compensation formulas that you read to assumed that Mr. West had some sort of basis for expecting or receiving a penny more than the $8.57 million he got in 2010. In the language you gave me at the beginning from 2325, that's the overview thing, this umbrella paragraph? Yeah, it defines the claim. And then it says it's expected earnings minus actual earnings. And then there are two definitions. Definition D is the definition, I think, of actual earnings, but definition K is the critical definition of expected earnings, those in 2010 that you expected in absence of the spill. Here, in absence of the spill, he expected exactly what he got. And we also think in terms of just that's the text, and in terms of the structure, we think other provisions of the settlement agreement use the word loss. It shows the parties thought they were compensating for people who actually suffered some sort of loss and were not unharmed. That being the case, why do you think both the claims administrator and the appeal panel went the other way? So the appeals panel went the other way for two reasons. The appeals panel didn't even acknowledge the loss argument. It did respond to BP's attestation argument, and that's sort of the second question that we briefed. And in the appeals panel's view, and we think the appeals panels are split on this, that appeals panel viewed the attestation requirement as an empty formalism, that you could actually make a false statement, that you can't even with a straight face contend that the claimant caused a spill. But as long as the financial information you provide, it's like you didn't doctor your tax returns. So there's a fundamental disagreement in the parties. There's other cases that present this issue about what the attestation requirement means. It's very important to BP, obviously, because not in just this case, which only involves a million and a half dollars, but there are other cases that involve significantly larger amounts of money. And we think that this case is an excellent vehicle to resolve that issue because I mean, to sum up, you're saying that even though they gave a very liberal proof of causation, which is pretty much zero, they still expected people to come in and say, yeah, I had a loss because of the spill. I mean, the blue form says the individual economic loss claims is for individuals who have experienced income losses caused by the spill. You didn't require much in the way of proof of that, but you require them to at least say, yeah, we had that. The self-serving affidavit works, but it needs to be there, is what you're saying. Yeah, I could not have said that better. So thank you. There's just one extra page. The very next page that you cited, that is another attestation that says, I'm a basketball player. That's on 998. Hi, I'm a basketball player. I work for the New Orleans Hornets, and that's the job for which I suffered a loss of earnings due to the spill. And in our view, that's laughable. Now, the other side says, all we had to do was not lie on our tax returns. But your formulation was exactly right. The settlement agreement dispensed with any and all evidentiary requirements. So even as long as you just sort of, like I said, with a straight face can say, hey, I think the spill caused me some harm. You don't have to come forward with any proof. I mean, that's why we lost Deepwater Horizon 3. But the court said five times, no less than five times, that you actually have to attest, in fact, to at least a belief that the spill caused you harm. You don't have to prove it. You just have to sign a form under a penalty of perjury. So when Mr. West went to sign that form, could he reasonably have looked at the language I asked you at the beginning on Exhibit 8A and said, well, I'm looking at this, and it looks like I suffered a loss, because all it says is, here's a benchmark period. All right, so I did that math, and then I apply this coefficient, and then I compare it to my earnings in the subsequent period, and it turns out, like, you know, one is better than the other. So, I mean, you're not saying he couldn't have done that, right, when he signed the attestation? I think, well, I don't, the attestation is not only to a loss that it was caused by the spill. And no, I don't think just meeting the formula shows anything. It just says, he thinks, he clearly had a good faith basis for thinking his revenue dropped, because that's what he agreed to, but he had absolutely no basis for thinking that had anything to do with the spill in the Gulf. Have other professional athletes filed claims? No. Okay. And he's the only one who figured this out, that he could do this? Yes, as far as I know. I mean, we probably, I think there may have been 400,000 claims, and we've seen, you know, like 130,000, we're at the very tail end of the settlement process, so I think there's just maybe a dozen left. Right. That's what Mr. Nielsen said to us yesterday, tail end. So that means there are 100,000 more to resolve? No. No, no, no. BP has paid 130,000. There's probably less than a couple dozen in the claims administrator. Now, the ones that are in the appeals panel stage and in the district court and before this court, numbers at about 120, 130. Really? Yeah. What do you know? Yep. So, but that's out of like 500,000 claims that have been filed. Why, so why, what is the significance of our ruling on this? Significance of your ruling is that there's a fair number of appeals before this court that raise it. Raise which? The attestation requirement. That totals $150 million just in three cases, not this case. So $150 million is a lot of money. And it's just that in this tail end, there were some big dollar items. So there are a couple cases before you where... One of which you dismissed tomorrow. Yeah, but that didn't involve an attestation requirement. Well, I thought it did. Okay. I think it had to do with whether an orchestra was tourism. Right. Well, but the one yesterday, on the other hand, had an attestation issue and the appeal panel said that the off rejected attestation issue or something like that. Yeah. And I know that Judge Haynes just said on a panel that had an attestation issue too, and there the appeals panel actually just resolved the factual dispute. Here, there was no factual dispute. The appeals panel just said there was no attestation requirement. I mean, there's not... I know he says, well, maybe we might could have negotiated something better or something like that, but there's not really any dispute about the way this contract was set up and what income he got and didn't get. So there's nothing for like the equivalent of a jury to decide, the appeals panel or the claims administrator. Again, you're absolutely right. What we have is conjecture, speculation that's unsubstantiated and it's purely conclusory. He says on page, let me just get the exact page, on page 19 that there's a speculation that he might have been provided more money in 2010, but the two scenarios he raises are legally impossible. So I don't even think if he pled this, it would pass article three because it's just not plausible. The first scenario is he might have got more money in 2010, but the team was at the salary cap. The second scenario, which I think is equally legally irrelevant, and it goes to the document he cited, was talking about contract extensions, and an extension, the money would kick in in 2011, and this one is clear. The settlement agreement is pollutive, that the compensable period has to be 2010. So sometime in 2010, he has to have a basis for receiving more money. Getting back to your issue one, if we were to articulate what the, you know, you're saying that what was it, deepwater three said we're not going to kind of define the outer edge, we don't have to define the outer edge, we're good with this case, what would be your definition of the outer edge then? So, and you clearly held that there's no per se obligation by the claims administrator to review an attestation in every case, but we do want you to hold, which is what the appeals panel aired as a matter of law, that that panel said there was a per se prohibition no matter how implausible the attestation is. So our standard is if the settlement program is presented with any credible evidence that the sole basis for the spill, I'm sorry, the sole basis for decline in revenue was something other than the spill, like the sole basis for the decline in revenue here was the contract. It just couldn't have possibly been the spill. There's a duty to investigate, and it's an abuse of discretion not to. We don't set the parameters, we just say the claims administrator needs to look at this and needs to not be prohibited from looking at, as my torts professor used to say, what really happened. Yeah, and if, and it's just, and like all discretionary standards, it would rise to a point of abusive discretion if confronted on the face with either a claim or BP's evidence saying yeah, but you signed a contract before the spill where you agreed to accept less money in 2010, and there's no other basis. So the spill couldn't have possibly caused harm. It's basically an Article III standard. This court avoided all the Rules Enabling Act and Article III standards saying there has to at least be an allegation of a harm and traceability to the defendant's conduct. And if you can't even get that kind of irreducible minimum to establish Article III, it would say what business are we in, for heaven's sake? Well, I think that this court, all courts lack Article III jurisdiction to award relief under a judicially administered contract. Okay, so then let's get back to the one other thing, which is what we're supposed to be doing more, which is reviewing Judge Barbier's failure to review this discretionarily. So in that prism, what would we be saying here? Just that the, I would do it under he just misread the settlement agreement, either as to loss or attestation. He failed, I'm sorry, he didn't misread it, the appeals panel did. All the district court is just an abuse of discretion for not reviewing an appeals panel decision. So he should have reviewed it when the appeals panel made two legal holdings, one, that you don't need a loss, and two, that the attestation requirement had no teeth. And if I could reserve the balance of my time for rebuttal. Yes, ma'am. Thank you. Thank you. Mr. Cooperman. Yes, Your Honors. May it please the Court.  I've got a question. There's a lot of talk about the trial process. Now, ordinarily, where a class action proceeds the trial, claimants are going to prove matters such as injury and causation later at the trial stage. And that proof can come in various forms. It can be documents, fact witnesses, expert witnesses. But the parties are also free voluntarily to reach a settlement and avoid a trial, just as defendants like BP do all the time for global peace. The results, the settlement- You're questioning how much peace they've got right now. Well, I understand. And that was their choice to structure it like this. The settlements are a result of the negotiation and compromise the parties give and take. Each determines what they can give up in return for what they can get. And they're free to do away, they can agree to do away with proof or to alter or substitute requirements for proof. That's what happens in virtually every settlement. Now, here, the parties negotiated at arm's length and they reached a resolution. Each side gave something up. The claimants, among other things, gave up the right to present fact witnesses and expert witnesses. It was all based simply on documentation. That is what the agreement requires, the documentation. BP agreed to substitute an objective mathematical formula for other methods of proving loss and causation. Now, importantly, BP has admitted that Mr. West is a member of the class, which means that BP admits Mr. West properly and in good faith alleged a loss, because that is what Deepwater Horizon 2 requires. Under the settlement, as a class member, the formula negotiated, agreed to, and set forth in the settlement then applies to prove loss and causation, including whether the loss is compensable and, if so, in what amount. Proof of loss... And now the attestation. Well, the attestation, I will tell you, is a false argument here, because they admit that Mr. West is a member of the class, which means, under Deepwater Horizon 2, that he adequately and properly alleged that he suffered a loss. Well, I'm sorry, but, you know, that seems to be such a broad principle that it would invalidate a bunch of cases where we have, in fact, overruled claims. No, I think... All you have to do is say, bring me, here's my form, I'm in the class, give me my money. I understand what you're saying now, Your Honor, but I don't think that's the case. What I do think, however, is that what happened here, the settlement that was agreed to by BP and the class substituted different forms of proof for loss and causation than would otherwise be required if the case went to trial. Now, under that formula, BP does not say, I mean, BP admits Mr. West, a proper application of that formula results in the compensation that he's been awarded. They don't contest... They're not contesting the math, but they're contesting getting to the math. Correct. Yes. However, the settlement is a matter of contract, and here, obviously, with a class action, the added benefit of oversight by the Courts for Absent Class, members like West. But its meaning is a matter of the contract interpretation. It's not Article III, despite what counsel said, and in fact... Yes. And the agreement specifically says that it has to be due to the Deepwater Horizon oil spill. That, I believe that what we're talking about there, Your Honor, is the part where counsel first also raised the expectation, the expected revenue issues. Actually, it's a different part, because I was talking to Ms. Blatt about exactly that question, and she reminds the Court that the Framework for Individual Economic Loss Claims specifically says that you can only seek loss compensation for lost earnings from employment due to or resulting from the Deepwater Horizon spill. Yes. And as you know... That's before you get to any expected earnings. I understand that. However, in addition to that, though, what she's also said is that that is based on Mr. West's good faith belief, which, one, they have said he had by acknowledging, and I know we may disagree, Your Honor, but that they said he had by acknowledging that he is a proper class member. They don't contest that. That's really what the attestation issue in terms of suffering the loss goes to. Are you really a class member? They don't challenge that. Now, what does happen here is, with regard to the, and if I can digress a second while I have it in mind, the expected earnings issue, where she talks about the expectation. The expectation, she cites to a kind of general view of what's expected, but I want to draw your attention back to Exhibit 8A on page 15. It actually has not the generic, oh, you have to have suffered a loss. You have to have had expected earnings. Expected earnings is defined in a mathematical formula in 8A, page 15. Expected earnings equal the benchmark period earnings calculated in Step 2, increased by the applicable growth factors from Step 3. Under that mathematical formula to which BP agreed, Wes suffered a compensable loss for which he can recover. Now, the, I think the basic idea here is that obviously specific terms of the settlement can substitute for other forms of proof, and that's what happened. Here, what BP's really arguing is, you file, you sign the attestation, and then you go to the compensation formula, because if you're a class member, they've agreed, once you're a class member, you look at the formula, and you see, are you entitled to compensation? They admit he's a class member, now you look to the formula, and they acknowledge under the formula he's due 1.4 million. But what BP is now trying to do is insert an intermediate step between class certification and application of the settlement's formula, and they say Wes failed that step. Well, what do you do with the Deepwater 3 claims for which the attestation is implausible or suspicious do not qualify for compensation? The court explained the parties explicitly contracted that traceability between the defendant's conduct and a claimant's injury would be satisfied at the proof stage, that is, in the submission of a claim by certification on the document. Yes, and that is, in fact, what happened. The Fifth Circuit held that suspicious forms would be subject to investigation, and the claims as they resolve other questions. Yes, and part of my answer, and I have several to that, one is that what they do is they look to see, in my view, what this settlement sets up is a view to look to see, are the claims implausible based on the materials, documents, based on what the settlement says you have to submit? That's what they look to see on suspicion. That is not, that did not happen here. Based on what they agreed would be submitted. Well, the documents would include the contract, and it seems awfully implausible when you look at the contract. They lost anything for any reason. One, they did not, in fact, that is not a required document under the settlement agreement. However, let me tell you that the way that this case, the way that this contract, the way that this contract was set up to front end load is precisely because some basketball players like that, because of the opportunity to renegotiate and extend the contract in the last year or two of the contract. I have no idea how they got the contract, and it's not in the record anywhere. In fact, they take issue that we say things outside the record, pointing to BP's own vice president and his statement that they expect some false positives and that they will not look to non-financial data down the road to determine. That's exactly what they're doing now, but BP acknowledged it would not do that. That's in the record. They said it wasn't. It is. It's attached to the briefing earlier back with the appeals panel. However, in our particular situation, the reason a lot of basketball players do that is to renegotiate. Now, strangely, of course, they bring in stuff that's not in the record. Let me tell you, let's talk about something that is in the record, that you have to show when you do your expected earnings calculation, even under the agreement that they made in substitute of the proper proof, as you pointed out, that the claimant's earning in the compensation period in the claiming job that would have been expected in the absence of the Deepwater Horizon spill. Right? That is one of the inputs into the formula. And I believe— In the absence. Right. And Mr. West had a valid belief that he was going to be able to renegotiate that agreement in the last year. And in fact, we can't forget that the Hornets, now known as the Pelicans, but the Hornets at the time, which was his basketball team, also have a claim and have been awarded more than $10 million by the appeals panel, the claims administrator, and the lower court. Now, the Pels—the Hornets, I'm sorry, I keep using their recent term—the Hornets, part of the problem there is, as they enter that last year, when they can renegotiate West's contract, they don't have the ability to do that. When West expects a renegotiation, he doesn't get it because of the spill. The Pels suffer a loss. The Hornets suffer a loss, I'm sorry. The Hornets don't know where they are going to stand or what they're going to be able to bring forward. They cannot go ahead and renegotiate his contract. By the way, the issue of whether there's a salary cap issue or not is unclear. That's certainly not in the record. Isn't this something the claims administrator should have at least investigated? I mean, maybe what you're arguing for is that it's not a reverse and render, but why isn't it a reverse and remand for at least—why isn't someone at least looking at this? Well, I can give you two answers to that one. One is, I don't think that in this particular case, the settlement agreement says it should be. No— What about Deepwater Horizon 3 that says, look, it's plausible? And maybe it's not under your theory of the renegotiation, but— Yes. I don't think it is implausible because of that. Okay. However, I can still answer that question. Okay. It looks awfully implausible. Yes. I understand what you're saying, but section—first of all, my first argument is, BP has not said that this intermediate step that I'm talking about, how you come forward and prove, they set forth no principle, no standard for judging when is it suspicious and how is that resolved. Well, they can—I mean, that's precisely why we're here, because this is an easy case. If you're going to set a standard, this being a case where the plaintiff had a contract, the contract was fulfilled precisely according to its terms, and therefore he suffered no loss. He got the benefit of his bargain. Except that had there not been a settlement, Mr. West couldn't— I understand that, but you're saying they have no principle as a backstop, and it's certainly a backstop. They don't—they don't set forth what the standard is to judge that. No, but what I'm saying is they don't have a—they haven't set forth a standard. Well, what is your standard? Because we do have Article III. We do have the concept that despite this somewhat interesting, unique settlement, we as the court still shouldn't just be judging stuff for fun. There has to be a case of controversy. And so how do you get past that, that there needs to be a standard, and what is that? Well, how would you define it? The case of controversy issue in Deepwater Horizon 2, this Court said that the standard to be applied is not a matter—this is once you've gotten into the class membership, which they admit he has—it's not an Article III standing issue, it's a matter of interpretation of the settlement agreement. So it's not a constitutional issue. I just wanted to make that part clear. Well, I question whether we should be spending time on someone who has not suffered a loss. But, see, that's where we disagree, because Mr. West had the expectation that he would, in fact, obtain a revised contract. And that's where I was going. Had there not been a settlement, he could have gone to court to approve that. That wouldn't have occurred until 2011. Is that not correct? Because his contract would be 2010 or 11. No, no. Usually what happens is they attempt to renegotiate the prior year. It actually fit exactly at the time of the fill. Well, I'm sorry, but that's the speculation business. That's—if you want to hold—if you're trying to hold BP to the contract, it's one thing, but you're trying to hold your client to something less than his contract, which is his, quote, expectation. Well, that's— That has no—no, that contradicts— That's the term, though. No, it's his expectation that contradicts his contract. Well, it is his expectation, which is what— That contradicts the contract. Whether it contradicts it or is consistent with it, it is his expectation, Your Honor. But let me go back to the other issue, which is— I have no doubt that were this a situation where he had to file an individual lawsuit, he never would have. That may or may not be true. I am not—let me go back to the other issue because I keep interrupting myself, and I'm sorry. I noted that BP has this intermediate step and doesn't point to anything in the settlement agreement, no provision whatsoever in the settlement agreement that allows this. I wanted to point out that Section 5.3.6.2 in the settlement agreement actually says that the framework governing individual economic loss claims—that's the formula— claims by all natural persons within the economic class definition. Now, they admit he's in the economic class definition. That language in there, to me, indicates that once you are a member of the class, and they, as I said, admit he is, then you apply the framework. Well, suppose they're not a member of the class, but they say they are. No, but they have acknowledged Mr. West is a member. I don't understand that. I'm talking about—I'm just talking about hypothetically. Suppose somebody—suppose somebody's the janitor at the—at the, you know, the basketball arena. Yes. Right, and they say they're a member of the class. Yes. They say that. Yes. Can they recover? It all depends on whether the application of the formulas will apply to allow that. Well, excuse me, but basically— What you're saying is that the formula is the formula is the formula, and therefore you get to recover. No, what I'm saying is that— Because you're—you're not allowing any scope for review of the—of the claimant's underlying fact. What I'm saying here is, in this particular case, I think they've acknowledged that he is a class member, and therefore there's no need to look at it. In terms of your hypothetical issue, where you have someone else, what bothers me or concerns— I haven't given a tremendous amount of thought to that because it doesn't apply here. However, what bothers me about it, again, is the lack of any principle. When does the claims administrator look? When—who decides whether it's suspicious? How does the claims administrator now— How does Judge Barbier or the appeals panel or the claims administrator actually look and apply this? There's a difference between a colorable claim, if you will, and a meritorious claim. In this particular—it could be the same, could be different. In this particular case, I think what Deepwater Horizon 2 said is, you need a colorable claim. What the colorable claim amounts to is a good-faith belief that there has been a loss that was suffered as a result of the spill, and that's what Mr. West— I'm the janitor. I'm making $9 an hour at the arena, and I get paid in part by the Hornets or the Pelicans, and therefore why—but I never had a— Well, you don't have the expectation—there is no loss. You weren't planning on renegotiating or getting a benefit. Well, if David West can get that money, why can't I? Well, Mr. West had a reasonable expectation, which they acknowledge. But the fact is, is that Mr. West did have that expectation. One of the problems here is we keep talking about things, and I admit, it's not in the record, and it's not in the record—this NBA collective bargaining, none of this is in the record. One reason it's not in the record, I think, is precisely because the settlement agreement restricts the information that can be submitted to certain information that is listed in the settlement agreement and requested. Well, another reason it's not in the record is because no one has looked at the claim. I mean, because of the way this has gotten to us, everyone has denied the discretionary review, and so what we're left with is all we know is a contract that says that Mr. West was going to be paid X with or without the Deepwater Horizon oil spill. Well, the contract itself is not in the record either. I just wanted to point that out. Well, you could have put— However— Well, you could have put any of that in the record in connection with your claim. Well, I could have, but there was no reason for me. I submitted exactly what the claims administrator asked for and what the settlement required. Isn't this exactly why Judge Barbier should have taken the case, so it can develop a record somewhere other than in the Fifth Circuit? I don't believe he was required to take the case. I think he exercised his discretion properly, and I do think that so did the appeals panel. They looked at all of this. There could have been information submitted at the time. It was not by opposing counsel, by BP. Are you saying they waived it? Well, I'm not arguing one way or the other on waiver, but I'm saying that's why it isn't in the record. I don't think it is incumbent on me because I fit the terms of the settlement agreement. You're not denying that the facts are what the facts—what we assume the facts to be, which is the existence of a contract running through the year 2010 with annually declining amounts of money. I am not going to deny that, Your Honor. That is accurate. I can only tell you what the expectation was of Mr. West as a result. Thank you, Your Honor. Yes, sir. Thank you. So should we be deciding a case on facts that aren't in the record? Well, you decide the legal questions. So the claims administration stage, BP is not even involved, so we don't see any of this. So that's why BP can't put anything in the record. At the appeals panel stage, we raised the issue because of the publicly available contract, and it should have just been gone back to the claims administrator to sort this out. So you're making judicial notice of something that's publicly out there? Yeah, well— Was it on a website or—? Sure, and he just admitted to it, but yes. I know, but, I mean, we ask lawyers to speak to us honestly as officers of the court. That doesn't change that an appellate record is irrelevant. Right. At the appeals panel, we said, hey, this guy, and it's consistent with his tax returns. They match the documents that say what his five-year record was. And we said, hey, he didn't attest in good faith to a spill-related loss, and he didn't suffer a loss. And the claims and the appeals panel said that's irrelevant. I don't care if he suffered a loss. So our role isn't to say what the contract says. It's to say that the appeals panel or the district court should have looked further and developed this record. Exactly. They applied a legal standard that was wrong. And so what is the—tell me, on the attestation, what do we do about the fact that he keeps saying 30, 40 times, I had this expectation, I thought I was going to make more money, just like if I owned a little shrimp shop on Poitras, I would have thought I was going to make some more money even if things weren't looking good for 2010 or whatever, and I can then recover even though nobody liked my shrimp. Right. Well, a shrimp shop owner doesn't have an exclusive contract with the New Orleans Hornets where there's only one source of revenue. But, two, David West has never said that under oath. You just heard a lawyer say it, that my client expected—had an expectation. But you're saying he misattested or he lied in his attestation, and his lawyer is saying, oh, no, no, he really thought he was going to get more money out of the Hornets and all this stuff. Yeah, with all due respect, no. His lawyer said, I don't have to. All I need is a loss calculation formula. He said three different things. I don't have to attest to nothing. I have to attest I'm a class member. Oh, and I promise you my client on remand can attest to a good faith-related spill loss. Make him say the third one on remand, please. Make sure that David West will say in good faith that he expected more money because he wasn't at the salary cap or that more money would have come in in 2010. And then you'll pay him? Of course. We've been paying—paid $11 billion so far. We brought this case for a reason, because we don't think David West will say that under oath. If he wants to say it, that's fine. Good for him. He can say that. On the bit about the class member. So the first time I've ever heard is the attestation went to class membership. That's incorrect for two reasons. Remember in JAD, this court went out of its way to say, you're a class member. You still lose. You're a class member. You sat and said, BP, don't bring us class member arguments anymore. We don't want to hear them. So fine. He's a class member. You still lost even though you met the formula. We don't care that you met the formula. You didn't have the documentation to show you were working. Here there's no documentation to show that his contract was anything other than fixed. So I don't think the class membership. And also on the attestation, the court five times said, you don't attest to a class member. You don't attest to an allegation. I'm swearing under earth that I'm alleging something. The court said five times, you have to attest to a causal nexus. Okay. I'll tell you what concerns me about this case. This is shockingly whatever on the part of Mr. West. So that seems like an easy case for you. But what worries me is that we then decide, we issue an opinion, and this has impact on other people, on the janitor and people like that, who you all chose to give a pretty light burden to prove causation in exchange for this buying of the piece that you all did. You didn't buy us any piece, but buying yourselves piece and presumably at least putting some cap on the ultimate outcome here. So what do you do about that? I mean, there is the next guy. That's what you're worried about, but we're worried about it too. The next guy who isn't so obviously. So the next guy, remember, we lose if the claims administrator resolves facts against us. So there's one. So if we send it back, you're saying West could still win and you'll live with that? We have to. Remember, you said the settlement program has the discretion to review implausible claims, and we're only saying there comes a point where there's an abuse of discretion. And let me just talk about Article III. If you're at the point you'd be laughed out of court and you can't even allege a harm, much less one that's traceable to the conduct, I don't care what lawyer and what admission, you can't confer Article III jurisdiction on a court. Let me ask you a technical question because you're with Kay Scholar. What's their names, the other firm? Gibson Dunn has been arguing a bunch of the other appeals. And Kirkland. I'm sorry, Kirkland. And I sat on one of their appeals where the question was the interpretation whether a claimant had the right to characterize whether something was a fixed or variable expense. And we held, as a matter of law, over an objection by one of our panel members, as a matter of law that misinterprets the settlement, and it is either this particular expense was not, whichever the party was saying, variable, or was not fixed. Excuse me. Okay, so we held that as a matter of law. It wasn't a question, and I guess we remanded it, but only for purposes of calculation. Right. No, I don't think you need to remand because in any Article III case. Well, your brief says remand. At a minimum, you have to remand. But in a normal course, you would not remand when you have a speculative conclusory allegation of expectation. Yeah, but they're going to say, well, we didn't develop this. I mean, it seems to me that if this contract's not in the record, his expectations aren't in the record, that doesn't argue for reverse and render. That argues for sending it back to the district court to say, look, you need to exercise your discretion and consider all this goo and sort it out. Not us. You, Judge Barbier, sort this out, and if you need to send it to the appeal panel and do that, have at it. That's what you've been arguing, and now you're saying reverse and render. That is a fair outcome. Okay. So I'm not going to argue. What is, I think, though, also a reasonable outcome is he could have said something that was actually not ridiculous. He said two things that were legally impossible, and when you put that in your brief and you don't put any substantiation, it is also within your discretion just to say we win. But it is also a reasonable interpretation to want to remand it and let the claims administrator develop the record. Well, I mean, that's because we are deciding whether the court failed to grant discretionary review properly. Which I think is clear. That seems to me to be a little bit different than just deciding the merits of the case as we do in all the other cases. Yes. I mean, you could say, though, the settlement agreement requires an attestation. It actually has teeth. He didn't say anything, an argument that made, you know, any sense. He didn't explain why there was no salary cap that's part of the public record and how he could have gotten more money in anything other than in 2011. But, Judge Haynes, you're right. I mean, a lot of times judges want to, court of appeals judges say, hey, this isn't my problem. I want to remand it. Well, I mean, it's our problem, but we don't develop facts. You don't develop facts, but you insist that parties make enough allegations in their pleadings and in their briefs. You don't say on appeal that you're going to remand it so the plaintiff can take another shot because he screwed it up the first time. It is that all along he had the opportunity to make an allegation. He wasn't told that he didn't have to. In fact, he was told he couldn't. I mean, you know, so if all of these entities were applying the wrong law, it's sort of like if the wrong burden of proof was applied, you don't just go, well, we'll apply it and we'll find for him. You send it back for the right burden to be applied. So here if all of these entities were saying, look, buddy, you've done all you need to do. Here's your $1.5 million. Here's your $1.5 million. It seems unfair, although, again, I have no sympathy for Mr. West, but I'm not here to judge people in their core. I'm here to judge the case. It's just because of a matter of law here. But if it's a matter of law we're saying he should have put on evidence of XYZ when he was told, no, no, no, no, no, no, no, just give us these documents, that doesn't seem fair. I'm making a different point. I agree with you. What I'm saying as a matter of law is we know already that there are no documents because the arguments he's making are legally irrelevant. He can't say in 2011, the last year of my contract, I would have gotten more money because nobody cares what happens in 2011. That's beyond the compensable period. So he can just sit there and say I want to remand so I can put a clown suit on, but wearing a clown suit doesn't get you relief, so you don't need to remand for that. That was my only point on that one. On that note. Okay. Thank you. Time has run out. Thank you very much. We stand in recess until 9 o'clock.